CITY OF PASSAIC, PLAINTIFF-APPELLANT, v. BOARD OF
CHOSEN FREEHOLDERS OF THE COUNTY OF PAS-
SAIC, DEFENDANT-RESPONDENT.

Argued April 5, 1954—Decided May 3, 1954.

*Mr. William N. Gurtman* argued the cause for the appellant.

*Mr. Isadore Rabinowitz* argued the cause for the respondent.

The opinion of the court was delivered by

VANDERBILT, C. J. The plaintiff's appeal from a summary judgment entered in the trial court in favor of the defendant (which should have been designated as the County of Passaic, *R. S.* 40:18–1 and 3; an amendment should be made accordingly) has been certified by us on our own motion while it was pending in the Appellate Division of the Superior Court.

## I.

For many years Broadway (formerly called Bloomfield Avenue) was maintained as a city street by the plaintiff. The street, which is 7,061 feet long, extends from Main Avenue, Passaic, to the line dividing Passaic and Clifton. At one point it crosses the right of way of the Delaware, Lackawanna

and Western Railroad Company by a bridge. On April 2, 1929 the Board of Commissioners of Passaic, pursuant to statute, adopted a resolution:

"RESOLVED: That the Board of Chosen Freeholders of the County of Passaic, are hereby requested, to take over and maintain as a county road, Broadway, from Main Avenue to the City Limits."

On May 8, 1929 the Board of Chosen Freeholders of Passaic County complied with the request of the board of commissioners by unanimously adopting this resolution:

"Resolved that the Board of Chosen Freeholders of the County of Passaic hereby acquire the following road in the City of Passaic under the provisions of an Act of the Legislature of the State of New Jersey, entitled 'An Act concerning Counties,' approved March 4, 1918, which road is designated as follows:
BROADWAY from the West line of Main Ave. to the City of Clifton Line, being 7061 ft. in length and 70' − 60' and 50' in width.
The said road so acquired shall be known as a County Road, and upon the adoption and consenting to this Resolution by the City of Passaic and the filing of a certified copy thereof with maps attached, in the office of the Clerk of the County of Passaic, the duty of keeping said road in repair shall devolve exclusively upon the Board of Chosen Freeholders of the County of Passaic, and all other powers and duties respecting such road shall be imposed and vested in said Board of Chosen Freeholders, as provided in said Act above referred to. * * *"

According to the city, in recent years the bridge has been allowed to fall into such a state of serious disrepair as to necessitate the city calling on the railroad and the county to make the necessary repairs. Both, however, refused to do so, the railroad claiming that it had been relieved of any responsibility for maintenance and repair to the bridge by reason of a contract dated June 30, 1926 with the city, while the county apparently gave no explanation for its failure to make repairs. Its response to the city's demand consisted of a resolution adopted May 7, 1952 relinquishing its jurisdiction and control over the road and returning it to the city:

"WHEREAS the Board of Chosen Freeholders of the County of Passaic, on the 8th day of May, 1929, by Resolution adopted at the

request of the City of Passaic, took over Broadway in the City of Passaic as a County Road; and

WHEREAS this Board now deems it advisable that said Road should be discontinued as a County Road and returned to the jurisdiction and control of the City of Passaic wherein the same is situated; and

WHEREAS under the provisions of *R. S.* 27:16–28, any board of chosen freeholders of any county may discontinue any County Road as such and return the same to the jurisdiction and control of the municipality wherein the same is situated;

NOW THEREFORE BE IT RESOLVED by the Board of Chosen Freeholders of the County of Passaic that Broadway in the City of Passaic, now a County Road, from the westerly side of Main Avenue to the Passaic City line at Brook Avenue, being 7061 feet in length and 70' – 60' and 50' in width, be and the same is hereby discontinued as a County Road, and the same is hereby returned to the jurisdiction and control of the City of Passaic wherein the same is situated, and the County of Passaic does hereby relinquish all jurisdiction over and responsibility for the construction, reconstruction, repair and maintenance thereof, and from and after the lapse of ten (10) days from the passage of this Resolution jurisdiction over said road shall vest in and the responsibility for the construction, reconstruction, repair and maintenance of said road shall devolve upon the governing body of the City of Passaic, as provided in *R. S.* 27:16–28."

Because of the alleged bad condition of the road the city proceeded to make the repairs at a cost of $125,767.08 and then instituted this action seeking reimbursement from both the railroad and the county.

The complaint consists of three counts. The first count is against the railroad alone. The second count charges that by virtue of its resolution of May 8, 1929 the Board of Chosen Freeholders of Passaic County was under a statutory duty to maintain the road, that it neglected to keep it in good repair, that due to the serious state of disrepair when it was turned back to the city in May 1952 an emergency existed which forced the city to make the necessary repairs and the plaintiff demands reimbursements from the defendant for those costs. The third count is generally to the same effect, except that both the railroad and the board of chosen freeholders are joined in the alternative. The action against the railroad is not involved here and that proceeding has been postponed to await the disposition of this appeal.

After the pleadings had been filed the defendant moved for summary judgment with respect to the second and third counts on the ground that there existed no genuine issue as to any material fact and that it was entitled to judgment as a matter of law. In support of its motion it submitted an affidavit of the clerk of the board, attached to which were true copies of the three resolutions hereinbefore quoted. The affidavit states that all of the repairs made by the plaintiff were made subsequent to the time that the defendant had discontinued the street as a county road. In support of the motion the defendant also submitted an affidavit of the deputy clerk of the city, to which was attached a copy of a resolution passed by the board of commissioners of the city on June 24, 1952 declaring that due to "the cracking of the sidewalks and protecting walls on the Broadway Viaduct" "it is imperative for public safety that the above conditions be corrected as soon as possible," and resolving "that an exigency exists in the Department of Public Works, and the said Department of Public Works is hereby authorized to do any and all necessary work in connection therewith without the necessity of public advertising."

At the argument in the trial court the defendant urged three grounds in support of its motion for summary judgment: (1) that in the absence of fraud the motive of the county in returning the road to the city was not a subject of judicial inquiry; (2) that the county was not liable for any moneys spent by the city in remedying a defective condition of the road which may have existed prior to the discontinuance thereof as a county road; (3) that even if the county were responsible, whether by common law or by statute, for the repairs to the road in question, the remedy for its failure to do so was limited to indictment, or to a proceeding in the nature of a *mandamus*, or to a statutory closing of the street as dangerous or unsafe for public travel. The trial court relied upon the second ground urged by the defendant in entering an order for summary judgment in its favor.

## II.

When the plaintiff, in April 1929, adopted a resolution requesting the board to take over the road in question and the board accepted same by resolution dated May 7, 1929, both acted pursuant to *R. S.* 27:16–5 which provides:

"A road, or portion thereof, owned or controlled by one or more municipalities, may be taken over by the board of chosen freeholders of the county in which it is located. Upon filing in the office of the county clerk a resolution of the board of chosen freeholders providing for the taking over of any such road, or portion thereof, accompanied by a resolution of the body having charge of the roads and highways in each of such municipalities consenting to the taking over of such road or highway, or portion thereof, located in the respective municipalities, the road or highway, or portion thereof, designated in the resolution, shall become a county road. The resolution may provide for the taking over of several roads or portions thereof."

There is no doubt that the steps taken by the parties were in accordance with the statute, and that commencing on May 8, 1929 Broadway became a county road. In legal effect the parties had entered into a bilateral contract under which the city gave up jurisdiction and control of the street while the county assumed this jurisdiction and control; nor can there be any question but that from that date the defendant was responsible for the maintenance and repair of the road, for *R. S.* 27:16–6 provides that:

"The duty of maintaining and keeping in repair every road so laid out and opened, taken over, or acquired, shall devolve exclusively upon the board of chosen freeholders, and all other duties and all powers respecting such road shall be imposed upon and be vested in it * * *."

By assuming control of the road the county accordingly became responsible for its maintenance and repair.

1. The defendant's first argument is that its motive in returning the road to the city in May 1952 is not a subject of judicial inquiry, but nowhere does the city effectively challenge the county's powers to relinquish the road under *R. S.* 27:16–28:

"Any road or portion thereof owned by any county or under the control of any board of chosen freeholders may be (a) discontinued as a county road and returned to the jurisdiction and control of the municipality wherein the same is situated * * *

a. Any road or portion thereof owned by any county or under the control of any board of chosen freeholders may be discontinued as a county road by a resolution passed by the affirmative vote of a majority of all of the members of the board of chosen freeholders, which resolution shall describe the road or portion thereof so sought to be discontinued as a county road sufficiently to clearly identify the same, and shall declare that the road or portion of road therein described shall be discontinued as a county road, and that the county shall and does relinquish all jurisdiction over and responsibility for the construction, reconstruction, repair and maintenance thereof. * * * And at the expiration of the period of ten days from the passage of the resolution the road or portion of road therein described shall cease to be a county road, and from thence-forward jurisdiction over the road or portion of road shall vest in and the responsibility for the construction, reconstruction, repair and maintenance of the road, or portion of road, shall devolve upon the governing body, as the case may be, of the municipality wherein the road or portion of road shall lie."

It cannot be disputed that as of May 17, 1952 control and jurisdiction of Broadway was returned to the city and that from that date the city was responsible for its future maintenance and repairs. The present action does not involve the question of responsibility for future maintenance and repairs. Rather it concerns the liability of the county for repairs that allegedly should have been made by the county while the street was under its control.

2. Next the defendant claims that it had the right by statute at any time to relinquish this control over the road, and in doing so it is relieved of any responsibility for repairs, even though the repairs were necessitated by the poor condition of the road that developed prior to its relinquishment of control under *R. S.* 27:16–28, *supra.*

As previously stated the defendant had the right to relinquish control over the road, and on May 17, 1952, ten days after its resolution, the road ceased to be a county road and from that date the responsibility for its repair and maintenance rested on the city. The statute does not, however, relieve the board of its responsibility for repairs and

maintenance during the period when this was a county road. R. S. 27:16–28 specifically states that the street ceases to be a county road "at the expiration of the period of ten days from the passage of the resolution" and "from thence-forward" jurisdiction and responsibility vests in the city. By no stretch of the imagination can this statute be construed as relieving the board of its statutory responsibility for maintenance and repair necessitated by a condition of the road which developed while it was under county control. It merely permits the board at any time to relinquish its future responsibility for the road and to return it to the control of the city.

Nor is it necessary that there be express statutory authority to impose liability to the city on the board for repairs due to past neglect of its statutory obligation to maintain and repair county roads. R. S. 27:16–6 places the duty of maintenance and repair upon the board. If due to the serious disrepair in which the city finds the road on its return to it by the county the city must make repairs, there is no reason in law or justice why the city cannot recover the cost of such repairs from the board. It is inconceivable that the Legislature should impose the duty of maintaining county roads upon the board without intending as a consequence that if the board defaulted in the performance of its statutory obligation it would be required to reimburse the municipality that was forced to make the repairs, nor is there anything in the statutes before us that would indicate a contrary intent. To permit the defendant's contention to prevail would be to tolerate the unjust enrichment of the defendant at the expense of the plaintiff by using the statutory power to return a county road to a municipality as a device for sliding its own existing responsibility for repairs on the back of the municipality. The power to turn back county roads was given to the counties for legitimate governmental purposes in meeting changing traffic conditions, not as a means of evading its accumulated responsibility for repairing and maintaining public roads.

3. Finally the defendant county contends that even if it is responsible for the repair of the road in question, the

remedy of the city was not to take the law in its own hands by voluntarily repairing the road and then seeking to recover its disbursements from the county. The county insists that the plaintiff's remedy is by indictment or presentment, or by a proceeding in the nature of a *mandamus,* or by the statutory remedy outlined or prescribed by *R. S.* 27:19–9. There is no merit to any of these procedural arguments. The defendant cites *Board of Chosen Freeholders of Sussex County v. Strader,* 18 *N. J. L.* 108 (*Sup. Ct.* 1840), where Strader alleged that he was driving carefully over a county bridge but due to the defective condition of the abutments one of his horses fell and was killed. The court held that although the duty to make repairs and keep the bridge in good condition rested on the county, Strader's action in tort was not maintainable. The court suggested that his only remedy was by indictment or presentment. The case is no longer the law, for by *R. S.* 27:19–10 an individual is given an action against the county for any wrongful neglect with respect to a viaduct or bridge, and *mandamus* has also been permitted against a county without reference to indictment or presentment, *Edwards v. Board of Freeholders of Sussex County,* 76 *N. J. L.* 454 (*Sup. Ct.* 1908). See *Garrou v. Teaneck Tryon Co.,* 11 *N. J.* 294, 303 (1953). If at the time this suit was filed the board had still retained control of the road and was thus still responsible for its maintenance, *mandamus* would have been the proper remedy to compel the board to fulfill its statutory obligation. But at the time this action was brought, the board had by its own voluntary act, as it was entitled to do under the statute, relinquished any future control over and responsibility for the road. By reason of this relinquishment of control to the city the board no longer had the right to make repairs. Since, as heretofore stated, the board was legally responsible for the condition of the road up until May 17, 1952, and yet refused to perform this duty, the city was well within its rights in making the necessary repairs and in seeking reimbursement from the board for those expenditures necessitated by the condition of the

road which developed during the time that it was under the control of the board. Nor is *R. S.* 27:19–9, as claimed by the defendant, the city's exclusive remedy. A reading of the statute discloses quickly that it was never meant to deal with main arteries of traffic such as is involved here nor with substantial repairs thereto:

"If any viaduct or bridge in any municipality, or between any two municipalities in the same county, or any viaduct or bridge over any ravine, marsh, river or stream dividing any counties in whole or in part, connecting two municipalities, shall at any time become or be rendered dangerous or unsafe for public travel, the governing body of either or both of the municipalities shall close such viaduct or bridge and its approaches until repaired or rendered safe for public travel.

Any such governing body or bodies may repair such viaduct or bridge, or cause it to be repaired provided the cost thereof shall not exceed one hundred dollars, and after the repairs shall have been completed the cost thereof shall be paid by the county treasurer, after claim therefor shall have been filed with the clerk of the board of chosen freeholders.

Upon the closing of any such viaduct or bridge the clerk or clerks of the municipality or municipalities closing it shall immediately notify the board or boards of chosen freeholders."

Obviously the statute is concerned with the hundreds or thousands of small viaducts and bridges on county highways throughout the State which by reason of some unusual situation may demand emergency repairs of a minor nature. The statute does not purport to deprive the city of any cause of action, as here, for reimbursement for substantial repairs made on behalf of the county.

 We are concerned here only with the sufficiency of the summary judgment granted by the trial court, and in considering the matter we have assumed, as we must, the truth of all the allegations of the complaint. We find that a good cause of action has been pleaded which is not barred by any defense asserted by the defendant, and the issues of fact that have been presented can only be determined at a full trial.

The judgment is reversed and the cause remanded for trial.

360

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6.

*For affirmance*—Justice WACHENFELD—1.